*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JUAN SANDRO CABRERA,

        Defendant-Appellant.

UNPUBLISHED
March 10, 2022

No. 352319
Ottawa Circuit Court
LC No. 19-043047-FC

Before: RIORDAN, P.J., and K. F. KELLY and SWARTZLE, JJ.

PER CURIAM.

Defendant Juan Sandro Cabrera appeals by right his jury convictions of first-degree murder, committing a felony that was motivated by membership or association with a gang (gang motivated felony), and carrying or possessing a firearm during the commission of a felony (felony-firearm). Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant was convicted after testimony and evidence demonstrated that he shot and killed the victim, Troy Wells, Jr., at the Hampton Inn Hotel ("Hampton") in Holland Township, Michigan, just after midnight on February 16, 2019. Evidence at trial suggested defendant was a member of a gang—the Holland branch of the Latin Kings—and he may have shot Wells under the belief that Wells was a member of a rival gang, the Gangster Disciples.

On the night of the shooting, defendant went to Room 230 at the Hampton with his friends, JDP[1] and Jose Luis Garcia, III. The group went to the hotel to celebrate Garcia's birthday and brought two semi-automatic rifles with them—an AR-15 rifle and a POF-USA P-15 multicaliber rifle—and about 100 rounds of ammunition. Also present with the three during some portions of the evening were Megyn Hanrahan and Skylar Hittle.

---

[1] JDP's initials will be used because he was a minor at the time of the incident.

Just before midnight, Wells and his sister, Jakara Hunter, arrived at the Hampton to visit another gathering at the hotel. When Wells and Hunter arrived, Wells did not immediately go into the party with Hunter. Instead, he walked down the hallway past Room 230 around the same time Hittle and JDP were leaving the room. Although JDP and Hittle did not at first notice Wells, JDP turned toward Wells and then walked up to him in the hallway just outside Room 230. Wells and JDP argued briefly and, when the door to Room 230 opened, JDP stated, "Look at this G f--k n----r," and pointed at Wells. Defendant subsequently stepped into the doorway, took aim at Wells with the AR-15, and fired at least 10 shots.[2] Defendant, Garcia, JDP, Hittle, and Hanrahan fled the hotel within minutes of the shooting, leaving behind the rifles and abandoning other evidence in a trash can.

At trial, Hanrahan, Garcia, and JDP identified defendant as the shooter. Defendant's attorney avoided discussing the video evidence or the testimony by the witnesses who were in the hallway; instead, defendant's defense centered on the assertion that Hanrahan, Garcia, and JDP were lying when they identified defendant as the shooter. The jury rejected that defense and convicted defendant as described. Defendant subsequently moved for a new trial, and the trial court held an evidentiary hearing to examine the adequacy of defense counsel's representation and consider a crime scene reconstruction video that defendant's appellate counsel prepared. After concluding the hearing, the trial court rejected each of defendant's claims of error and denied the motion. This appeal followed.

## II. STANDARDS OF REVIEW

This Court reviews de novo the question of whether the trial court "properly interpreted and applied the rules of evidence." *People v McFarlane*, 325 Mich App 507, 517; 926 NW2d 339 (2018). This Court, however, reviews a trial court's decision to admit or reject evidence for an abuse of discretion. *People v Brown*, 326 Mich App 185, 195; 926 NW2d 879 (2018). This Court also reviews for an abuse of discretion a trial court's decision on a motion for a new trial. *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012). A trial court abuses its discretion when it selects an outcome that falls outside the range of principled outcomes. *Id*.

In addition, "[t]his Court reviews a challenge to the sufficiency of the evidence by examining the 'record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were

---

[2] The hotel had numerous video cameras that captured the events of that night. Detective Michael Tamminga obtained the video evidence and testified at trial. He prepared still images from the videos and identified the various persons who appeared in the videos and pointed out to the jury specific clothing that the persons depicted were wearing. Only one camera captured the events in the hallway outside Room 230. That camera captured the confrontation between Wells and Palomares, and recorded the shooting. However, because the shooter did not step fully into the hallway, the video only shows the shooter's left arm and left leg with the rifle protruding from the entryway to Room 230. The video shows that the shooter wore a long-sleeved, black shirt and black pants, and had on black shoes with reflective material. The only occupant of Room 230 wearing such clothing was defendant.

proved beyond a reasonable doubt.' " *People v Clark*, 330 Mich App 392, 436; 948 NW2d 604 (2019), quoting *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009).

To establish ineffective assistance of counsel, defendant must first show that (1) his trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Uphaus*, 278 Mich App 174, 185; 748 NW2d 899 (2008). "Effective assistance of counsel is presumed and defendant bears the burden of proving otherwise." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008).

## III. IDENTIFICATION TESTIMONY

Defendant first argues that it was error to allow Detective Tamminga to identify the persons who appeared in the videos taken from the hotel. He maintains that defense counsel should have objected and that his failure to do so amounted to ineffective assistance. He further argues that the trial court abused its discretion when it denied his motion for a new trial premised on this error.[3]

A lay witness may not testify about a matter unless he or she has personal knowledge of it. See MRE 602. However, a lay witness may testify as to his or her opinion or inferences if the opinion or inference were "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." MRE 701.

On appeal, defendant asserts that a lay witness may never offer an opinion concerning the identity of a person who appears in a video or an image. That, however, is an overstatement of the law. A lay witness improperly invades the province of the jury if the witness offers an opinion or interpretation on a fact at issue when the witness is in no better position than the jury to evaluate the evidence and decide the fact at issue. See *People v Perkins*, 314 Mich App 140, 161-162; 885 NW2d 900 (2016), superseded in part on other grounds sub nom *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016). The same is true for the interpretation of video evidence; a lay witness cannot offer an opinion or interpret the video evidence when the lay witness is in no better position than the jury to evaluate the evidence. *People v Fomby*, 300 Mich App 46, 52-53; 831 NW2d 887 (2013). However, when the lay witness has some special knowledge that gives the witness a better ability to interpret the evidence, the witness's testimony is admissible if it is helpful to a clear understanding of the witness's testimony or it is helpful to the determination of a fact at issue. See *id*. at 53; MRE 701.

The prosecutor submitted into evidence the footage from seven cameras from the Hampton and submitted a timeline that Detective Tamminga prepared during his review of the video evidence. Detective Tamminga estimated that he "probably" viewed the video recordings 50

---

[3] Defense counsel did not object to Detective Tamminga's testimony at trial. As such, defendant did not preserve the claim that the trial court erred when it allowed Detective Tamminga to testify about the identities of the persons who appeared in the videos and still images. See *People v Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999). Accordingly, we review the claim for plain error that affected the defendant's substantial rights. *Id*. at 763.

times. He also informed the jury that he created the time line from his review. Detective Tamminga told the jury about important details related to the video system such as the frame rate for the videos and the information collected by the camera system and the placement and operation of the cameras. Detective Tamminga's testimony about the video system was proper lay testimony because it concerned information that he collected about the system from personal knowledge or inferences that he rationally drew from his perceptions. See MRE 602; MRE 701.

Detective Tamminga's testimony also demonstrated that he had special insight into the video evidence that permitted him to offer opinions about the persons depicted in the videos and images. See *Fomby*, 300 Mich App at 52 (noting that a lay witness may offer an opinion about identification when the record showed that the lay witness was more likely to correctly identify the person than the jury). For example, it was evident that Detective Tamminga reviewed the Hampton's records and investigated who stayed in the rooms in the vicinity of the room where the shooting occurred. Detective Tamminga also had firsthand knowledge of the initial investigation and persons involved, which enabled him to express an opinion about who appeared in the video images at various points. On the basis of his experience with the video system, his investigation into the hotel records, and his personal experience interacting with the individuals depicted in the videos, Detective Tamminga had a better ability to identify the persons depicted, so he could properly offer an opinion about the identity of those persons. See *Fomby*, 300 Mich App at 52. He could also properly identify details depicted in the images, such as details about the clothing worn by persons depicted in the videos—because his extensive review of the video evidence made it more likely that he would notice those details. *Id*. at 53.

Detective Tamminga did not express an improper opinion on defendant's guilt. See *id*. at 52. The fact that Detective Tamminga's testimony implicated an ultimate issue also did not render his testimony improper. See MRE 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). Detective Tamminga's testimony did not improperly invade the jury's function as the sole determiner of the facts; the jury was free to reject his opinions. See *McFarlane*, 325 Mich App at 523 ("[T]he jury is free to reject [the witness's] opinion on the basis of the evidence adduced at trial, including a contrary opinion by another expert."). Instead, he offered lay testimony derived from his investigation into the events at issue, his interactions with the persons involved, and his extensive review of the video system and the videos captured by that system. Because he did not offer an opinion on defendant's guilt, and because his testimony was otherwise rationally based on his perceptions and helpful to the jury's understanding of the events captured on the video, Detective Tamminga's testimony identifying various persons depicted in the video evidence and still images was admissible. See *Fomby*, 300 Mich App at 52.

Because his testimony was admissible under MRE 701and did not otherwise invade the province of the jury, see *id*. at 52-53, the trial court did not plainly err when it allowed Detective Tamminga to offer opinions about the identities of the persons depicted in the videos and images, see *Carines*, 460 Mich at 763. Defense counsel does not provide ineffective assistance by failing to make a meritless objection. See *Clark*, 330 Mich App at 426. Finally, because the trial court correctly concluded that Detective Tamminga's testimony was proper, it did not abuse its discretion when it denied defendant's motion for a new trial premised on Detective Tamminga's identification testimony. See *Brown*, 326 Mich App at 195.

Even if it was plain error to have allowed Detective Tamminga to offer identification testimony because he was in no better position than the jury to determine the identities of the persons depicted, such error would not warrant relief. The majority of the persons involved in the events of the night at issue testified at trial and described their actions. The witnesses' testimonies corresponded with Detective Tamminga's identifications and independently verified his identifications. Moreover, had defense counsel prevailed on an objection to Detective Tamminga's identifications at trial, the prosecutor could have played the relevant section of each video and asked each witness to identify himself or herself on it.

Given the record, it was beyond dispute that the prosecutor verified the identifications made by Detective Tamminga and, had he not made the identifications, the prosecutor could have established the identities of the persons depicted in the videos without Detective Tamminga's testimony. Indeed, at the evidentiary hearing, defense counsel testified that he was not concerned about Detective Tamminga's identifications because it was evident who each person was in the videos. Accordingly, even if it were plain error to allow Detective Tamminga's testimony, the error was harmless. See *Carines*, 460 Mich at 763.

Because it was evident that the prosecutor could readily establish the identity of each person depicted on the videos, defense counsel could reasonably choose to let Detective Tamminga make the identifications as a matter of trial strategy rather than have the prosecutor repeatedly replay the videos for each witness so that he or she could identify himself or herself on the video. See *Clark*, 330 Mich App at 427 (defense counsel's performance does not fall below an objective standard of reasonableness when there was a legitimate strategic reason for the decision). Similarly, because the prosecutor could have readily established each person's identity through that own person's testimony, and defendant's identity could also have been confirmed by various witnesses, any failure by defense counsel to object had no discernable effect on the outcome. See *Uphaus*, 278 Mich App at 185 (stating that the defendant must demonstrate that, but for defense counsel's act or omission, there was a reasonable probability that the outcome would have been different).

## IV. GANG TESTIMONY

Defendant next argues that the trial court erred when it allowed Detective John Mark DeYoung to offer testimony about gangs and that defense counsel provided ineffective assistance by failing to object to Detective DeYoung's testimony.[4] We disagree.

In addition to the first-degree murder charge, defendant was charged with committing a gang motivated felony under MCL 750.411u. To prove that charge, the prosecutor had to show that defendant was an "associate or a member of a gang," that he committed or attempted to commit a felony, and that his "association or membership in the gang provide[d] the motive, means, or opportunity to commit the felony." See MCL 750.411u(1). A "gang" is defined as an "ongoing

---

[4] Defendant's claim that it was error for the trial court to allow Detective DeYoung's testimony is unpreserved because defense counsel did not object to the testimony at trial. Thus, we review defendant's unpreserved claims of error for plain error that affected defendant's substantial rights. See *Carines*, 460 Mich at 763.

organization, association, or group of 5 or more people" that identify themselves by a "unifying mark, manner, protocol, or method of expressing membership, including a common name, sign or symbol, means of recognition, geographical or territorial sites, or boundary or location," that has an "established leadership or command structure," and that have defined "membership criteria." MCL 750.411u(1)(a).

Gang culture, gang structure, gang symbols, and how gang members associate, advance, and identify each other are beyond the common knowledge of ordinary persons. As such, it is appropriate for an expert to testify about those concepts. See *People v Kowalski*, 492 Mich 106, 25-26; 821 NW2d 14 (2012) (expert testimony is relevant and helpful when the expert's testimony addresses issues that are beyond common knowledge). An expert on gang culture may offer such testimony when there is a connection between the crime at issue and the defendant's gang membership. See *People v Bynum*, 496 Mich 610, 626-627; 852 NW2d 570 (2014) ("In the context of gang-related violence . . . expert testimony may be admitted regarding general characteristics of gang culture for an appropriate purpose, such as helping to elucidate a gang member's motive for committing a gang-related crime.").

Because the prosecutor charged defendant with committing a gang motivated felony, the prosecutor had to prove beyond a reasonable doubt that defendant was associated with a gang and that his association with the gang—in relevant part—supplied the motive for his decision to commit the felony, which in this case was the shooting and killing of Wells. See MCL 750.411u(1). Accordingly, testimony about gang culture and how gang members identify themselves was relevant to determining whether defendant was in a gang and whether he was motivated in some way to shoot Wells as a result of his association with a gang. See *Bynum*, 496 Mich at 626.

When otherwise relevant and admissible, an expert on gangs may testify about the "significance of seemingly innocuous matters—such as clothing, symbolism, and tattoos—as features of gang membership and gang involvement." *Bynum*, 496 Mich at 626. An expert may also testify about aspects of gang culture that might shed light on a gang member's motivation. *Id*. at 626-627. An expert may testify, for example, that a person has a tattoo that amounts to an identification of gang membership. *Id*. at 629-630. An expert may not offer testimony, however, that connects gang-related character traits to defendant's conduct on a particular occasion. *Id*. at 631.

Detective DeYoung testified about gangs in general, and the Holland branch of the Latin Kings in particular. He described the Latin Kings's symbols, the structure of its organization— including the three levels of participation—and the culture of the gang. He also described the symbols used by a rival gang, the Gangster Disciples. He explained that the Latin Kings were territorial, and he informed the jury about how one might advance in the gang. Detective DeYoung's testimony on those matters was helpful for the jury's understanding of the evidence and was consistent with the expert gang testimony permitted under *Bynum*.

Defendant, however, complains that Detective DeYoung went too far when he offered an opinion about the clothing that police officers seized in this case, and when he offered an opinion about the persons depicted in trial photographs. With respect to the clothing, Detective DeYoung agreed with the prosecutor that the clothes seized were consistent with those worn by the Latin

Kings. Detective DeYoung also described the clothing for the jury and explained the features the clothing had that were consistent with the Latin Kings's symbolism. Under *Bynum*, there was nothing improper about Detective DeYoung's testimony concerning the clothing. The testimony and other evidence that the clothing was worn or used by defendant also did not cause Detective DeYoung's testimony to be improper. Because his testimony was admissible for a proper purpose, Detective DeYoung could offer an opinion that embraced the ultimate issue as to whether defendant's use of the clothing and symbolism was evidence that he was associated with the Latin Kings. See MRE 704.

Defendant also argues that Detective DeYoung went too far when he testified that the persons depicted in trial photographs—JDP and defendant—were wearing clothing consistent with the symbolism used by members of the Latin Kings and that they were flashing hand signs used by members of the Latin Kings. Detective DeYoung's analysis of the image identified elements of the image that were consistent with membership or association with the Latin Kings, and he did not testify that the image established that the persons depicted were in fact members of the gang. Indeed, when questioned about the same image on cross-examination, Detective DeYoung agreed that JDP was wearing clothing whose colors were associated with the Latin Kings, wore a bandana on his face, was holding a rifle, and was making the three-point hand sign associated with the Latin Kings. Nevertheless, Detective DeYoung refused to state that JDP was in fact a member of the Latin Kings on the basis of that image.

Although Detective DeYoung's opinion about the symbolism used in the image embraced an ultimate issue—whether defendant was actually associated with the Latin Kings—he could offer such an opinion under MRE 704, and his testimony about the image otherwise fit within the parameters of permissible gang testimony under *Bynum*.

Defendant further maintains that Detective DeYoung's testimony was improper because it amounted to improper character evidence. Detective DeYoung's testimony about the clothing and symbols that defendant displayed in the image did not implicate MRE 404(a), which prohibits the admission of evidence of defendant's character in order to prove action in conformity with that character on a particular occasion, because it did not involve an improper character-to-conduct inference. Detective DeYoung's testimony established that certain acts—wearing clothing and making hand signs—were consistent with gang membership. Contrary to defendant's contention on appeal, Detective DeYoung did not testify that defendant was a gang member, that gang members have a specific character, or that defendant acted consistent with that character on a particular occasion. Detective DeYoung's testimony was admissible to prove an essential element of the offense of committing a gang motivated felony; as such, it was not barred under MRE 404. See *People v Aguwa*, 245 Mich App 1, 8; 626 NW2d 176 (2001) (stating that evidence of acts involving the essential elements of the charged offense do not implicate MRE 404).

Defendant similarly maintains that it was improper for Detective DeYoung to testify that shooting someone—especially a rival gang member—would likely qualify as "doing dirt," which would allow a newer gang member to advance in rank. However, Detective DeYoung could testify about aspects of gang culture that might establish a gang member's motive for committing a crime. See *Bynum*, 496 Mich at 630 (stating that motive is always relevant and that an expert on gangs may offer testimony about gang culture that establishes motive). He could not, however, interpret the evidence shown to the jury and offer an opinion connecting the gang traits to defendant's

conduct on a particular occasion. See *id*. at 631. Contrary to defendant's contention on appeal, Detective DeYoung's testimony did not make that improper connection. Detective DeYoung only stated that shooting a member of a rival gang would meet the requirement of "doing dirt," which was necessary to advance in rank. He did not interpret the evidence and offer an opinion that defendant acted consistent with the general motive to advance his rank on the occasion at issue. Thus, the trial court did not plainly err when it allowed the testimony, see *Carines*, 460 Mich at 763, defense counsel did not provide ineffective assistance by failing to object to the testimony, see *Clark*, 330 Mich App 426, and the trial court did not abuse its discretion when it denied defendant's motion for a new trial premised on Detective DeYoung's testimony, see *Brown*, 326 Mich App at 195.

## V. SUFFICIENCY OF THE EVIDENCE

Next, defendant argues that there was insufficient evidence to establish the elements of committing a gang motivated felony. More specifically, he argues that there was no evidence that, if he was the shooter, he was motivated by his association with a gang to shoot Wells. We disagree.

Detective DeYoung testified that a "future" was not a full member of the Latin Kings. Full members were referred to as "brothers," he stated, and a "future" could only become a "brother" by carrying out an order to "do dirt." Detective DeYoung gave examples of "doing dirt," which had advanced "futures" into full "brothers" in his past experience. He agreed that shooting a member of a rival gang would constitute "doing dirt."

JDP testified that defendant told JDP that he was a member of the Latin Kings. He had also witnessed defendant "shake up" with other members—a form of greeting—which only members of the gang could do. Garcia testified that he associated with members of the Latin Kings and knew that defendant was a "future" in the Latin Kings, not a brother. He also stated he witnessed defendant "shake up" with other members of the Latin Kings. Thus, the testimony by JDP and Garcia was sufficient evidence from which the jury could find that defendant was associated with the Latin Kings as a "future." See MCL 750.411u(1).

There was also strong evidence that defendant was motivated by his gang membership to shoot Wells. There was evidence defendant had been acting peculiar while at the Hampton and was particularly fixated on his rifle. Witnesses stated he posted himself at the door to the room and grabbed a rifle every time he and his companions suspected that someone was in the hallway outside their door. There was also testimony that defendant and JDP were concerned about encountering members of rival gangs at the hotel. Taken together, the testimony and evidence permitted an inference that defendant was alert to the possibility that he might encounter a member of a rival gang. Finally, there was testimony that JDP loudly banged on the door to Room 230 during his encounter with Wells and that, when Garcia opened the door, JDP intimated that Wells was a member of a rival gang, the Gangster Disciples. Consequently, there was sufficient evidence to support the jury's verdict that defendant was associated with the Latin Kings and that his association motivated the shooting. See *Clark*, 330 Mich App at 436.

## VI. FAILURE TO INVESTIGATE

Defendant next argues that the trial court should have granted his motion for a new trial premised on his claim that defense counsel failed to investigate flaws in the video evidence. He also maintains that the trial court abused its discretion when it refused to consider the video that he had prepared depicting a possible reconstruction of the shooting. On appeal, defendant frames this claim of ineffective assistance as one involving a failure to investigate. More specifically, he maintains that, had defense counsel thoroughly investigated the prosecutor's still images introduced at trial, he would have realized that the individual frames showed that the person who appeared at first blush to be shooting Wells had an awkward stance and held the rifle in an unconventional way. This in turn, he relates, would have led defense counsel to a new theory: that the person with the long-sleeved shirt whose hand appears to be on the rifle and who appears to be shooting Wells was in fact trying to thwart the real shooter, who was out of view and obscured by the person in the long-sleeved shirt. Therefore, he concludes, the failure to investigate deprived him of a substantial defense and warrants a new trial.

Defense counsel had a duty to conduct a reasonable investigation or to make a reasonable decision that additional investigation was unnecessary. See *People v Trakhtenberg*, 493 Mich 38, 53; 826 NW2d 136 (2012). At the evidentiary hearing, defense counsel testified that he reviewed the video evidence submitted by the prosecutor but did not conduct a frame-by-frame review of the video evidence. Defense counsel agreed that he could have argued that the video showed defendant standing behind JDP, the real shooter, but that it was not a plausible argument. Moreover, he noted that defendant did not inform him that he tried to push away the rifle. Defense counsel agreed that the video was very problematic for the defense and that it was his strategy to move the emphasis away from the video and focus instead on the inconsistencies in the testimony by the witnesses in the room who identified defendant as the shooter.

The fact that defense counsel might have done more to investigate, or might have come up with additional theories to undermine the prosecution's theory of the case, does not by itself establish that defense counsel provided ineffective assistance. See *People v Blevins*, 314 Mich App 339, 351; 886 NW2d 456 (2016) ("Although defendant believes that additionally presenting an expert on eyewitness testimony would have been helpful, and defendant may even be right, that counsel could conceivably have done more, or that a particular trial strategy failed, does not mean counsel's performance was deficient."). Defense counsel knew that there was overwhelming evidence that identified defendant as the person who shot and killed Wells. Defense counsel knew that the prosecutor intended to call all the witnesses who were in Room 230 on the night at issue, and knew that those witnesses would identify defendant as the shooter. The evidence also demonstrated that defendant purchased the rifle used to shoot Wells, brought the rifle to the hotel room, took an image with himself holding the rifle, and was the one who repeatedly grabbed the rifle when unknown persons knocked at the hotel room door. Accordingly, defense counsel knew that evidence would strongly connect defendant to the rifle and the shooting. On this record,

defense counsel did not render deficient performance for failing to go to the extreme lengths that appellate counsel did in an effort to find some way of undermining the video evidence.[5]

There was no evidence that defendant—or anyone else in the room—had been trained to fire an AR-15 rifle. Indeed, the evidence established that defendant had only owned the AR-15 rifle for a few weeks. There was also testimony that defendant held the door open with his foot, which would explain the awkward stance. As such, a reasonable defense lawyer reviewing the evidence could conclude that the fact that the video showed the shooter using an unconventional grip was not suggestive that the video did not accurately depict the person who was holding the rifle. Moreover, testimony established that the video cameras captured four or five frames a second and that the video appeared choppy as a result. The low frame-capture rate and choppiness of the video explained the strange appearance of the movements depicted in the still images taken from the video. Given the video evidence, a reasonable trial lawyer could conclude that it was unnecessary to further investigate the video by obtaining software to create new still images or by securing an expert on video evidence because further investigation would not lead to a viable defense. Consequently, although defendant established that defense counsel could, in theory, have done more to investigate the video evidence, he did not establish that defense counsel's failure to further investigate fell below an objective standard of reasonableness under prevailing professional norms. This does not by itself establish that defense counsel provided ineffective assistance. See *People v Blevins*, 314 Mich App at 351.

Under the circumstances of this case, defense counsel's decision to pursue a defense premised on misidentification of the shooter was reasonable. There was no doubt that defendant was in Room 230 when the shooting occurred. There was also independent video evidence and testimony by witnesses outside the room that the shooter's clothing and build were consistent with defendant and no other occupant of room 230. Finally, the three other occupants of Room 230 definitively identified defendant as the shooter. The decision to try and plant the seed of doubt in the jury's mind by emphasizing the problems with the testimonies of those three witnesses was a sound strategy; indeed, it may have been the only viable strategy available to defense counsel. See *People v Toma*, 462 Mich 281, 303; 613 NW2d 694 (2000) (recognizing that the facts of the case may limit a reasonably competent lawyer's options for presenting a defense). Accordingly, the trial court did not err when it determined that defense counsel's investigation and chosen defense fell within the range of competent representation and did not amount to ineffective assistance of counsel.

---

[5] An individual reviewing the video in real time would have no indication that the video captured anything other than a single person aiming and firing the rifle at Wells. Moreover, even when freezing the video or looking at the still images created by the prosecutor, there is no indication that the video showed more than one person in the doorway or otherwise depicted a struggle over the rifle. Even the still images that defendant provided on appeal do not suggest that the video captured more than one person. While some of the videos show that the shooter's hand appeared to be on top of the rifle and suggest that the shooter had an awkward stance for holding a rifle, that evidence does not suggest that the person in the long-sleeved shirt was not in fact holding the rifle and shooting Wells.

The trial court also did not abuse its discretion when it refused to consider the video that defendant presented at the evidentiary hearing, which purported to reconstruct the shooting in a way that showed how the video camera could have recorded defendant's presence in the doorway with his hand on the rifle, yet still be consistent with someone else being the shooter. The trial court had the discretion to allow the admission of demonstrative exhibits or demonstrative aids. See *People v Bulmer*, 256 Mich App 33, 35; 662 NW2d 117 (2003). Demonstrative evidence must meet the requirements of admission: the evidence must be relevant and probative. *People v Castillo*, 230 Mich App 442, 444; 584 NW2d 606 (1998).

The testimony from the evidentiary hearing established that the videographer who created the video started from the premise that defendant was not in fact holding the rifle and did not shoot Wells. He then worked backward from that conclusion to show how it was theoretically possible that the video recorded defendant in the doorway with his hand on the rifle even though someone else was holding the rifle and shooting Wells. The testimony from the evidentiary hearing showed that the videographer recreated the shooting on the basis of facts that were inconsistent with the facts established at trial.

Setting aside the testimony from the witnesses in Room 230, who all identified defendant as the shooter, there was independent evidence from two other witnesses that established that the shooter wore clothing and had a physical build that was consistent with defendant's build and clothing and inconsistent with the builds and clothing of any other person in Room 230. Additionally, the actual video of the shooting appears to show someone's hand on the rifle's barrel from about the time the rifle appears in the doorway and throughout the shooting. There was no indication in the video evidence that the hand on the rifle caused the rifle to move erratically. The evidence concerning the trajectory of the shots showed that the shooter also consistently aimed in Wells's direction. Consequently, defendant's recreated shooting did not reflect an equally plausible explanation for what could be seen in the actual video because the recreation used factual assumptions that were contrary to the undisputed facts of the actual shooting. The testimony and evidence from the evidentiary hearing also demonstrated that the videographer used actors whose height, weight, build, and clothing did not match the physical characteristics and clothing of the actual participants in the events. The videographer further did not use the hotel's actual security camera to record the recreated events. Instead, the videographer placed a different camera below the hotel's camera, which altered the perspective somewhat. There was also no evidence about the differences in the camera used to record the reconstruction—such as the frame rate—from the camera that actually captured the images on the night at issue.

When considered as a whole, it is evident that the proposed reconstruction did not faithfully recreate the event on the basis of known facts. See *Lopez v Gen Motors Corp*, 224 Mich App 618, 628 n 13; 569 NW2d 861 (1997) ("When evidence is offered to show how an event occurred, the focus is upon the conditions surrounding that event. Consequently, it is appropriate that those conditions be faithfully replicated."). Rather, the videographer operated on assumptions that were not supported in the record and altered material facts to such a degree that, had the video been offered at trial, it would have been inadmissible because it would not have aided the jury in reaching a conclusion on a matter that was material to the case. Accordingly, the trial court did not abuse its discretion when it refused to consider the video of the reconstructed shooting. And because the trial court correctly determined that defendant failed to show that defense counsel

provided ineffective assistance, it did not abuse its discretion when it denied defendant's motion for a new trial premised on defense counsel's failure to challenge the video evidence.

## VII.  PREMEDITATION AND LESSER OFFENSE

Defendant also argues that the trial court should have granted his motion for a new trial on the grounds that there was no evidence of premeditation and that defense counsel was ineffective for failing to argue premeditation to the jury and for failing to request an instruction on a lesser offense of murder.  We disagree.

In this case, the prosecutor charged defendant with first-degree premeditated murder.  As this Court has explained, "[w]hen first-degree murder is premised on premeditation, the prosecutor must prove that the defendant acted with the intent to kill the victim and must show that he acted deliberately and with premeditation."  *Clark*, 330 Mich App at 436.  "A murder is committed deliberately if done without adequate provocation—that is to say while undisturbed by hot blood, and it is premeditated if the perpetrator had the opportunity to consider his or her actions for some length of time before completing the murder."  *Id*. at 436-437 (citations omitted).  The prosecutor can prove premeditation with circumstantial evidence:

> In proving an actor's state of mind, the jury may rely on circumstantial evidence and the reasonable inferences arising from that evidence; indeed, minimal circumstantial evidence is sufficient to establish that a defendant had the intent to kill and proceeded with deliberation and premeditation.  The prosecutor may establish premeditation and deliberation through evidence of the parties' prior relationship, the defendant's actions before the killing, the circumstances surrounding the killing itself, or the defendant's conduct after the killing.  [*Id*. at 437.]

On appeal, defendant asserts that there was no evidence that he had a prior relationship with Wells—or even knew who he was—and that there was no evidence that he brought the rifles for any reason other than to show them off.  He further claims that there was no evidence that he heard JDP identify Wells as a member of a rival gang just before the shooting.  Finally, he states that the circumstances of the shooting suggest that the shooter did not have time to reflect on his actions.

The evidence showed that defendant broke the rifles down, concealed them in a suitcase, and had them brought into the hotel room where he hid them in the closet by the door.  The rifles' magazines were loaded.  This evidence permitted an inference that defendant prepared the rifles for firing and had them ready to fire in a convenient location should the opportunity for their use arise.  The evidence also demonstrated defendant was hypersensitive to persons coming and going in the hallway.  Defendant acted strange whenever someone passed in the hallway and had posted himself by the door during what was otherwise supposed to be a birthday celebration.  He also grabbed the rifle on at least two occasions—as if to be ready for action—when visitors knocked on the door.  There was testimony that defendant and JDP were also concerned about the possibility that rival gang members might show up to the Hampton.  Taken together, this was compelling evidence that defendant was prepared to shoot at any person whom he perceived to be a threat.

Finally, the circumstances involving the shooting tended to demonstrate that defendant acted deliberately and with premeditation. When JDP banged on the hotel door, Garcia checked the peephole, and defendant obtained the AR-15 and approached the door. Once Garcia opened the door and JDP proclaimed, "Look at this G f--k n----r," defendant stated "Move," stepped into the doorway, took aim at Wells, and began firing. The evidence that defendant retrieved the rifle, had the presence of mind to order JDP or Garcia to move out of the way, stepped up to the doorway, aimed, and began firing was compelling evidence that defendant acted deliberately and with the opportunity to contemplate what he was doing before firing the first shot. See *Clark*, 330 Mich App at 437. The trial court did not err when it determined that there was sufficient evidence to support the jury's finding of premeditation.

Although another lawyer in defense counsel's position might have argued that the evidence did not support a finding of premeditation, defense counsel stated that he pursued the alternative defense that the prosecutor failed to show beyond a reasonable down that defendant was the shooter. Once defense counsel made the decision to challenge the element of identity, he had to determine whether he should also challenge other elements. Defense counsel testified that he chose not to do so because, in his experience, juries do not reward defendants who argue that they were not the killer, but, if they were, they did not premeditate the killing. He also recognized the problem with the evidence that the shooter shot Wells even after he turned to run. That is, defense counsel recognized that an argument about premeditation was weak and inconsistent with his claim that defendant was not the shooter.

Defense counsel could, if he so chose, present inconsistent defenses. See *People v Lemons*, 454 Mich 234, 245; 562 NW2d 447 (1997). However, defense counsel could—as a matter of trial strategy—refrain from arguing one defense in order to avoid undermining another. Similarly, defense counsel could pursue an all-or-nothing defense premised on identity and forgo an instruction on the lesser offense of second-degree murder. See *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013) (the decision of trial counsel to seek or not seek a lesser included offense instruction is a matter of trial strategy). The fact that defense counsel's strategic choices did not persuade the jury does not establish that defense counsel provided ineffective assistance. See *People v Stewart*, 219 Mich App 38, 42; 555 NW2d 715 (1996) ("The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel.").

Defendant failed to show that his defense counsel's decision to focus on identity to the exclusion of premeditation and his decision to force the jury into an all-or-nothing decision on the issue of first-degree murder fell below an objective standard of reasonableness under prevailing professional norms. Consequently, the trial court did not abuse its discretion when it denied defendant's motion for a new trial premised on the sufficiency of the evidence of premeditation and defense counsel's decision not to argue premeditation or request an instruction on a lesser offense.

## VIII. AUTOPSY PHOTOS

Next, defendant argues that defense counsel provided ineffective assistance because he did not object to the admission of Wells's autopsy photos. Defendant contends the probative value of the images were outweighed by the danger of unfair prejudice because the images were no longer necessary after Dr. Stephen Cohle, the medical examiner, testified about the number and extent of

the injures, the apparent trajectory of the shots, and opined on the manner and cause of death. We disagree.

Relevant evidence is generally admissible. MRE 402; *Roper*, 286 Mich App at 91. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. The images that the prosecutor asked to admit at trial were relevant as visual aids to understanding the testimony of Dr. Cohle. See *People v Mills*, 450 Mich 61, 72-74; 537 NW2d 909 (1995) (providing that images of a victim's injuries may be relevant to corroborate a witness's testimony).

Taken together, the images were relevant to the jury's understanding of the circumstances regarding the shooting and for assessing the weight and credibility of Dr. Cohle's testimony. The images visually verified that Wells had been shot multiple times and that the shots generally had to have come from his left. The images also lent weight to Dr. Cohle's testimony that Wells had been shot from the front and back. Accordingly, the evidence was relevant and admissible. See MRE 401; MRE 402. Moreover, although relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice," MRE 403, the fact that images at issue were gruesome did not itself require exclusion. See *Mills*, 450 Mich at 76. Rather, the inquiry was whether the probative value of the images was substantially outweighed by the danger of unfair prejudice. See *id*.

The images were disturbing in that they showed the extent of the substantial damage caused by the gunshots, but they were not so gruesome that a reasonable juror would be unable to fairly assess their probative value—that is, there was no danger that "evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect." *Id*. at 75-76 (quotation marks and citation omitted). Because the images were relevant and their probative value was not substantially outweighed by the danger of unfair prejudice, the trial court did not abuse its discretion when it initially allowed the admission of the images. See *Brown*, 326 Mich App at 195. Additionally, although the images were not *essential* to understanding Dr. Cohle's testimony, they were admissible to lend weight and credibility to it. See *People v Layher*, 464 Mich 756, 764-765; 631 NW2d 281 (2001) (stating that the jury is entitled to assess all evidence that might bear on the accuracy and truth of a witness's testimony). As such, defendant failed to show that the admissibility of the images changed in such a way after Dr. Cohle testified that would warrant their exclusion under MRE 403. Moreover, because the images were not inadmissible under MRE 403, defense counsel did not render ineffective assistance to defendant for failing to object to their admission on that basis. See *Clark*, 330 Mich App at 426 (defense counsel is not ineffective for failing to make a meritless motion).

## IX. CUMULATIVE ERROR

Lastly, defendant argues that, even if no one error warranted a new trial, the cumulative effect of the errors warranted a new trial, and the trial court should have granted his motion for a new trial on that ground.

The cumulative error doctrine is part of a reviewing court's harmless error analysis. See *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002). The doctrine recognizes that

the cumulative effect of several minor errors may warrant a new trial even though no one error warranted a new trial on its own. *People v Cooper*, 236 Mich App 643, 659-660; 601 NW2d 409 (1999). In assessing whether multiple errors undermined confidence in the trial, reviewing courts must examine only the unfair prejudice caused by actual errors. *LeBlanc*, 465 Mich at 591 n 12. In this case, defendant has not identified any actual errors on appeal. Therefore, there is no prejudice to aggregate, and the trial court did not abuse its discretion when it denied his motion for a new trial on the grounds of cumulative error.

Affirmed.

/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly
/s/ Brock A. Swartzle